Turning to the fourth case of the morning, United Wisconsin Grain v. Archer Daniels Midland. And we welcome Mr. Cohen to the podium when you're ready. That is appeal number 22-2993. Thank you, Your Honors. May it please the Court, I'm Austin Cohen on behalf of Plankton Propellants. First, I want to emphasize that we are here on a Rule 1236 motion to dismiss. Just one month ago in this land, this Court reaffirmed that a complaint should not be required to, quote, plead or match facts to elements of legal theories. We filed this as supplemental authority. Instead, quote, once a complaint has identified a plausible antitrust claim, further development requires discovery, economic analysis, and potentially a trial. Mr. Cohen, we don't have a whole lot of time, so if I might just get to a couple of points raised in your appeal. First of all, as I understand it, your theory is that ADM can artificially deflate the price in the Argo market, thereby artificially deflating price, ethanol prices in the rest of the United States. Is that correct? That is correct. By manipulating the Chicago price indexes at the Argo terminal, which are used to set both ethanol and ethanol derivative prices in the U.S. markets, they function in both markets. The prices move in lockstep. The markets are inextricably intertwined. So the prices in the Argo market control the prices nationwide, basically? That is correct. Okay. And so your theory is that ADM artificially deflated the prices in the Argo, thereby artificially deflating prices nationwide. Why did the defendants raise in their brief the notion that then the supply and demand curves in the nationwide market really have no relevance to price in the nationwide market? Because as you say, the price of Argo controls nationwide. So why is the relevant market for the prices of your particular antitrust claim, why is it not the Argo terminal market as opposed to the nationwide market? Well, there are a couple of parts to that. The first part is that the Argo terminal market, the goal there was by flooding it with supply to drive down the prices that they offered at the low-cost prices, they didn't have to exclude other sellers at the market. Well, nobody's going to come into that market and sell at a lower price. They would sell at other markets where hopefully they could get a higher price. So it wasn't a matter of restricting suppliers from coming into Argo terminal. They wanted to restrict demand by using the physical limits of the market, which we allege in our complaint. As to the price nationwide, because the industry practices to use in formula pricing, 70% of the ethanol sold in the United States is priced by reference to the Chicago price index. Right, right. No, I understand all that. But my question is, so at some point under the predatory pricing scheme that you allege, ADM has to charge, has to install super competitive prices, right? Yes. Nationwide. And under your theory to do that, ADM has to, whatever happens in the nationwide market, ADM has to be able to install super competitive prices at the Argo terminal because Argo prices control nationwide prices, right? Correct. So then why aren't we, why isn't the proper inquiry, the Argo market, to determine whether or not there are competitors that would be able to come in and compete with ADM as it tries to raise prices to super competitive rates? Who cares about the producers nationwide? Because as you say, the price nationwide is controlled by the Argo price. Correct. So as a predatory pricing claim, the first phase of this scheme was to reduce the U.S. supply because the supply at the Argo terminal in a competitive market would reflect buyers who come in as long as the price there was- But why is the supply in the U.S. market relevant at all when it comes to U.S. price?  Like I said, then the supply demand curve nationwide have no relevance to price nationwide because it's all dictated by Argo. So why not just look at Argo? In the shorter run, there's some truth to that. Now, the 70% of ethanol sold is not necessarily price. But that's the crux of your whole claim, right? Is that the Argo benchmark prices dictate national price. So it's hard to see how you can get off of that now to any degree and have your antitrust theory kind of hold water. And so back to my question, why isn't it relevant whether or not there are going to be competitors present in the Argo market as ADM tries to raise its prices in Argo? Because if you look at, for instance, paragraph 125 of the complaint, the goal was to use predatory pricing, so control U.S. prices to drive down the prices in the U.S. market until competitors were forced out of the U.S. market. At that point, the supply in the U.S. market goes down and even the supply- Maybe I'm not articulating my question right. Generally, when you look at the price of a market, right, any market, the shoe market, what have you, you look at the product market and geographic market, right? And generally, the way price is dictated is the intersection between supply and demand, right? Basic economics 101, Act 10, whatever you want to call it. And what you're saying is the relevant price, the Argo price. And so why aren't we looking at the supply and demand curves at Argo? Because what the supply and demand curves are nationwide have no relevance to what those prices are because people are just looking at the Argo price. So why does it matter what competitors there may be nationwide outside of Argo if that's not what is dictating or underlying the Argo price? So the, first off, during the predation phase, the supply at Argo was artificially increased and they offered it below cost. There was no reason for others to come in to compete with them on lowering the price more. So that's phase one, which is trying to get rid of competitors, right? And so then turning to phase two, when you look at, okay, will they be able to charge super competitive prices, one of the things you look at is, well, are there any competitors left? Correct. And what ADM says is that there's no allegation in the complaint with regard to whether or not there are going to be any competitors left because the only competitors that plaintiffs have identified as being excluded are not competitors in the Argo market, but competitors nationwide in irrelevant markets. The only competitors being excluded from, are you saying from the Argo term? My understanding is that plaintiffs have not identified a single competitor that ADM excluded from the Argo market as biased predatory pricing scheme. Is that correct? We did not identify any other suppliers who were excluded from the Argo market because nobody would sell at the Argo market. It takes time and the cost to ship to it to sell there when ADM was supplying more than the demand at that terminal and was selling at prices that were below what they would have gotten at other locations. Then let's say that phase one ends and then ADM is like, okay, great. No one here but us, so now we're going to start jacking up the prices, right? And what is to keep other competitors from coming into Argo then and limiting the amount of price increases ADM can impose at Argo? So that's, again, that's at paragraph 125, what will keep them from doing that is once they drove 500 million gallons out of the U.S. market, then the supply of the Econ 101, the supply-demand curve is different. So even in the state of Argo market, the price would be higher in the platform. Let's say hypothetically that those suppliers were not in Illinois, but let's say those suppliers were in California, on the East Coast, and yet let's say that there's a couple of suppliers in Illinois that are just waiting for that price to get above a certain level, right? And then as ADM does that, those suppliers can then jump into the Argo market, right, take advantage of the higher prices, and then that supply-demand would balance. So do you have any particular allegations in your complaint that say that competitors will not be able to enter the Argo market during that super-competitive phase? During the super-competitive phase? Yes. No, what we say is that the supply in the U.S. market would be down, they were seeking to enter into an oligopolist type of arrangement. It's set forth at 125 and the strategy where they talk about combining and reducing the number of competitors in the market. So it's a change of the supply-demand imbalance in the but-for world going forward, but this is also a predatory pricing claim. We've also argued in our papers that this can be viewed as index manipulation because you have them profiting in real time on their over-investment in the derivatives. So while they were manipulating the price of ethanol down and losing money on their ethanol sales, they were making more money on the derivatives than they were losing on the sales that they needed to manipulate the index down. And there's plenty of cases out there allowing for commodities market participants who are injured by index manipulation to have standing and to recover damages from what they suffered. That's the Sanner case. That's the Merced case, which is actually a very good case if you go through it. In that case in Merced, the claim there was that Barclays manipulated the index up and down depending on whether they had long or short positions. And the case says that it was legitimate for them to seek damages as a class for super competitive or sub-competitive prices. Let me ask you about recoupment. Yes. I do need you to address that. You just spoke about Sanner. How do we have room, given Sanner, given Atlantic Richfield, to find that ADM can recoup its losses in this other market, this derivatives market, as opposed to on higher prices, monopoly prices in the initial market? So as a Section 2 attempt at a monopolization claim, index manipulation claim, you don't have to get to the element of predatory pricing, which would look to the post-predation phase. They could have just engaged in index manipulation. But assume we are still in the predatory pricing claim. So we're looking at element 3 there, the issue of recoupment. Just assume we're not going down the market manipulation route. Okay. So if you are in the predatory pricing claim, or the predatory pricing branch, what they did by manipulating the index was they caused the price in the U.S. to be depressed. During that phase, during the predation phase, everyone else in the U.S. market, or at least 70% of them, including our clients, had to sell their ethanol for depressed prices because the industry practice was using formula pricing. So we have standing. We are injured. As soon as they put this scheme into operation, as soon as they started buying those derivatives, those were buying derivatives as soon as they started pressing the index. But I'm asking about how they recouped their lost profits from earlier in their scheme. Well, they were recouping them in real time. So in other words, when they started this scheme, before they even started the scheme,  before this, they purchased derivatives in proportion to their production. They were hedging their risk. They got permission. They started purchasing derivatives that far exceeded the amount of ethanol they produced. So they were, I think, in the complaint, it talks about the fact that they were purchasing derivatives that represented twice as much ethanol as they could even produce. So they're purchasing those short derivatives, and they're using their sales at Argo, especially during the MOC window when they controlled 90% of the ethanol sold during that window, to depress the indexes. Those indexes are used in the derivatives market to price the derivatives. They profit from the derivatives. The amount of money that they made from the derivatives was more than enough to recoup their losses. But I'm asking you, Sanert tells us to look at the effect on rivals in terms of the recoupment. And Atlantic Richfield teaches us that it can't be an allegation of injury to the market generally. And so what you're talking about, how they got their money back in the derivatives market later, how can we marry that with what Sanert and Atlantic Richfield are telling us? So you can marry that. Well, first off, by doing that, they were depressing prices in the market. We allege at paragraph 91, numerous competitors who were forced out of the market due to negative margins. We also have allegations of their specific communications, intrafirm communications, where they talk about the thesis of their scheme was margin destruction until the market could recoup. So for recoupment, you want us to loop back to the top of the elements and go back to the entire theory to understand how recoupment works. For recoupment, it's a cross-market recoupment. There are two interrelated markets that are certainly intertwined. They're recouping on their investments, fixed investments in the speculation, but it's not really speculation, in the derivatives because they know that they're going to make money on the shorts. While they're doing that, this is really a two for one. In one sense, this is unprecedented because we have index manipulation cases, we have predation cases. This is both in one because they happen to be one of the largest ethanol manufacturers and one of the largest derivative traders in the country, and they figured out a scheme where they could capitalize on the vulnerabilities of this market to manipulate the index, profit on the derivatives, drive competitors out of the ethanol market until the supply would be reduced by 500 million gallons. Now, there are cases in this literature that talks about the idea of cross-market, cross-product recoupment. Even Brook Group talked about the idea that the recoupment there was supposed to be from the sales of branded cigarettes post-predation, not from the sales of generic cigarettes. And Jonathan Baker in an article says, although the parties agreed there were two segments within one market, they could have said these were two markets and it would have been cross-market recoupment. So, in that case, they considered it cross-product recoupment. This is, we've said it is an ethanol market and a derivatives market, they're intricately intertwined. You could say they're two markets with cross-market, you could say they're related products under SANA where they merge at the end, it's cross-product recoupment. But the recoupment is occurring in real time. There's no deterrence in this scheme. Like in Roseacre, the issue was it's self-deterring because they'll never get to the recoupment phase. They're recouping as they are incurring predatory losses on the commodity. All right, you'll get some rebuttal time. Thank you, Your Honor. All right, Mr. Glaberman? Or Glaberman? You had it right, Your Honor. Okay. Good morning and may it please the Court. Scott Glaberman on behalf of Archer Daniels Midland. Unless the Court would prefer otherwise, I would propose to address the two main topics already discussed this morning. Those are the two reasons that we contend the complaint was properly dismissed and also should have been dismissed. The first of those reasons is the lack of exit from the relevant market. The second is the lack of recoupment in the form that the Supreme Court requires and that this Court requires. So, taking the question of the relevant market first, the District Court correctly held that exit has to be assessed from the perspective of the Argo market. That is the market where the allegedly predatory prices were charged. In the context of a predatory pricing scheme, it's three stages. The first is below cost prices. The second is those prices causing the exit of competitors. And the third is the exit of those competitors enabling monopoly prices to be charged. So, here plaintiffs are alleging that ADM used predatory prices at the Argo terminal market. The next question then is, did those prices at the Argo terminal market cause competitors to exit the Argo terminal market? Because only if that is true and only if monopoly prices were charged at Argo, where there was a dangerous probability of those prices, could there be a claim here. The position of the plaintiffs now that we should be looking at the U.S. market simply doesn't make any sense in the context of this case. Because in the U.S. market, ADM has only a 10% market share. And it has no ability to impose monopoly prices under a normal supply and demand functioning of that market. Even if there were to be a few competitors who left that market, ADM would still be left with a 10.3% share or a 10.5% share. Again, far too low for ADM to impose monopoly prices. But more to the point, the complaint alleges, as was discussed earlier in this argument, that prices at Argo dictate the U.S. prices. So, the only way to impose super competitive prices in the U.S. market is to impose them at Argo. And ADM has not done that. There is no allegation that ADM could do that. And in fact, in its reply brief in this court, plaintiffs say ADM does not have the power to do that. That's on page 19 of their opening brief. So, given that, or excuse me, page 9 of their reply brief, I beg your pardon. So, given that ADM did not have the ability to raise prices at Argo, it could not impose monopoly prices there, and it could not impose monopoly prices across the United States. There have always been competitors at Argo throughout the entire time period of this case, and there remain competitors there today. So, given that plaintiffs agree that no competitors left Argo, and plaintiffs themselves didn't leave Argo, they were never there in the first place, the district court was correct to dismiss this case for that reason and for the plaintiff's inability to state a claim for predatory pricing. The other issue is the issue of recoupment. And it's critical to keep in mind when thinking of recoupment that the third stage of a predatory pricing claim is recoupment, meaning recoupment for its own sake, meaning getting the money from somewhere else. The third stage of a predatory pricing claim is monopoly prices. That is the key thing, and it's the key thing because only the monopoly prices provide the necessary antitrust injury, which is an essential part of every antitrust claim, and of course an essential part of the claim that plaintiffs are making here. In Brook Group, the Supreme Court said that ongoing or imminent monopoly profits lasting long enough to recoup are required. In Schor v. Abbott Labs, this court said that if a manufacturer cannot make itself better off by injuring consumers through higher prices, antitrust law has nothing to say about it. That's exactly the situation here. And in Wallace v. IBM, again in this court, the court said that the law's worry in a predatory pricing claim is the final period. It's that period of monopoly prices because that is all that provides the necessary antitrust injury. Here, plaintiffs are alleging that ADM is recouping through gains in the futures market, but that's really, even if true, that would be of no import to this case because consumers are not injured if ADM has gains in the futures market. There's no allegation in the complaint in this case that anything ADM does in the futures market provides any injury to plaintiffs whatsoever. In its first decision on our motion to dismiss the original complaint in this case, the district court held that plaintiffs had nothing but speculation that ADM could or would ever raise prices on ethanol itself. And nothing in the amended complaint changed that. Still, all they have is speculation. There are no factual allegations making that kind of claim plausible. To turn now to Sanner, which was the subject of Your Honor's questions, Sanner was the only case the district court cited in support of holding that recoupment from some other place, from futures, suffices. The district court excused the requirement of monopoly prices that actually injure consumers. And it quoted Sanner as saying that for some commodities, the futures and cash markets are so closely related that the distinction has no consequence for antitrust standing. And the word standing there is important. The court was discussing antitrust standing, not separately antitrust injury. And in Sanner, the court explained that what it meant by antitrust standing was the concept of causation, that the injury alleged flowed from the conduct alleged, and more that it was a direct flow, not indirect, not derivative. And so in Sanner, the district court was faced with a situation, or excuse me, this court was faced with a situation in which the plaintiffs, who were soybean farmers, were selling soybeans in the cash market, in the physical market. But the alleged manipulation from the Chicago Board of Trade was manipulation of the futures market. And what this court said is, the complaint in our case alleges that those two are closely related. So manipulating one is manipulating the other. And so that could state a claim. Here, however, we don't even have that issue. ADM is alleged to have manipulated the price of physical ethanol. The plaintiffs produce physical ethanol and sell physical ethanol. So there is no issue about manipulating one market to get to another market. They are claiming manipulation in this market. So they have no causation or directness problem. But here, they have the antitrust injury problem, which is not a point that Sanner has ever been used by another court to discuss. The requirement is that consumers be injured in the form of higher prices. And here, they have not been. If the court has no questions, I'd be glad to stand on our briefs. Thank you, Your Honor. Okay, Mr. Cohen, you'll be given your two minutes. Thank you, Your Honor. So, Your Honors, I'd like to first respond to Judge Lee's question, hopefully a little more directly. First off, the issue here is that in a competitive market, the ARGO price reflects what the U.S. price should be when the market is functioning properly. Now, the prices there that set the index are set there for that reason, because it's supposed to reflect broader U.S. market and broader U.S. client demand. Okay? ARGO or ADM knew that they could not raise the prices at the ARGO market for exactly the reason that you are saying. If they tried to raise the prices, other sellers would be incentivized to come there and sell their ethanol for a higher price. So instead, what they needed to do was come up with a scheme that allowed for them to actually reduce the U.S. supply of ethanol, because once the U.S. supply of ethanol was reduced, the new supply-demand balance would allow for a higher price at ARGO and a higher index price. So ADM at that point could step back and allow for the new supply-demand to raise the price. As far as the recoupment argument that was just made, let me address Rose Acre focused on the idea, as I was saying, of recoupment after predation ends. And the issue in Rose Acre that Judge Easterbrook emphasized was when you have that and you have failed predation, there's a disincentive because the predator loses money on their predation sales, their below-cost sales. This does not have any disincentive for ADM to try this again and again and again until they get it right, because they're not just recouping their losses. They're making a profit on their index manipulation. And the last point I just wanted to quickly address was that ADM claims competitors never have standing to bring a Section 2 claim because they state the antitrust laws are intended to protect consumers and not competitors. That's patently false. It's never been the law. There's a luminous precedent supporting the idea that the law is designed to protect competition and ensure competitive prices. The Supreme Court noted in Spectrum Sports in 1993 that the Sherman Act is designed to make illegal, quote, conduct which unfairly tends to destroy competition itself. An anti-competitive price can be higher or lower than a competitive price, but both are illegal. Thank you, Your Honor. Okay, thank you. Thank you to both the parties, and we'll take this case under advisement.